UNITED STATES of America, Appellant,

v.

KON YU–LEUNG, Cheng Kim Leang, Kon Pui Fong, Kon Yu–Son, Chew Tai Li, Lee Kwun, Hsu Haung–Yao, Fong Chi Chung, Helen Chow and John Ruotolo, Defendants,

John Ruotolo, Defendant–Appellee.

No. 349, Docket 89–1281.

United States Court of Appeals, Second Circuit.

Argued Nov. 1, 1989.

Decided July 25, 1990.

David C. James, Asst. U.S. Atty., E.D. N.Y., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., Catherine E. Palmer, Patricia A. Pileggi, Asst. U.S. Attys., E.D. N.Y., Brooklyn, N.Y., of counsel), for appellant.

John F. Byrne, New York City (Michael F. Grossman, Samuels & Grossman, New York City, of counsel), for defendant-appellee.

Before MINER and MAHONEY, Circuit Judges, and CARMAN, Judge.*

MAHONEY, Circuit Judge:

The government appeals, pursuant to 18 U.S.C. § 3731 (1988), from an order of the United States District Court for the Eastern District of New York, Thomas C. Platt, Jr., *Chief Judge*, granting defendant-appellee John Ruotolo's motion to suppress physical evidence seized from his home during a consent search. The district court granted Ruotolo's motion because Ruotolo was not informed, at the time he consented to the search, that he had been indicted. The district court determined that a postindictment consent to a search is a critical stage of a criminal litigation to which the sixth amendment right to counsel accordingly attaches, and that Ruotolo could neither knowingly and intelligently decide whether to proceed without counsel nor validly consent to the search without being informed that he was under indictment.

We reverse and remand for a determination whether Ruotolo's consent was voluntarily given. We conclude that a consent to a search is not a critical stage of a criminal litigation. Accordingly, the sixth amendment right to counsel is inapplicable, and a fourth amendment analysis as to voluntariness is appropriate.

*Background*

On March 13, 1988, John Ruotolo was arrested at his home in Montclair, New Jersey pursuant to an arrest warrant which had been issued December 21, 1987. The consent search of his home that ensued shortly after his arrest is the subject of this appeal.

On December 21, 1987, the same day the arrest warrant was issued, a grand jury in

---

* The Hon. Gregory W. Carman, United States Court of International Trade, sitting by designation.

the Eastern District of New York returned a sealed, fourteen-count indictment that charged Ruotolo and nine other defendants with, *inter alia,* conspiring to import substantial quantities of heroin into the United States from southeast Asia between January, 1984 and December, 1987. The Drug Enforcement Administration ("DEA") planned to arrest the indictees the evening of March 13, 1988. The scenario called for the initial arrest of the leader of the organization, Kon Yu–Leung, followed in quick succession by the arrest of the other defendants worldwide.

Accordingly, between 8:00 and 9:00 p.m. on the evening of March 13, 1988, six DEA agents went to the vicinity of Ruotolo's home with the warrant for his arrest, and awaited word of Kon Yu–Leung's arrest. The agents wore civilian clothes and did not have their badges displayed. Upon being advised that Kon Yu–Leung had been arrested, the agents proceeded with Ruotolo's arrest at approximately 11:00 p.m. Agent Michael Pasterchick, who led the Ruotolo arrest, went to the side door of the house with four other agents, and the remaining agent went to the back of the house. Pasterchick, with his gun hidden but drawn, knocked on the door, which was answered by Ruotolo's thirteen-year-old daughter. Without identifying himself as a police officer, Pasterchick inquired as to Ruotolo's whereabouts. The daughter responded that her father was in the kitchen. She led Pasterchick to the kitchen, where he identified himself as a federal agent and arrested Ruotolo, placing him in handcuffs.

Pasterchick had been advised that Ruotolo, who had been a police officer in New York City for approximately twenty years, would most likely have numerous weapons in the house. Upon inquiry, Ruotolo confirmed the presence of guns. Ruotolo also told Pasterchick that his wife and two other children were in the house. Mrs. Ruotolo and the other children were summoned to the kitchen. Subsequently, Mrs. Ruotolo and the children were taken to a "library-type room" by a female agent.

Pasterchick and four other agents conducted a security sweep of the house, accompanied by Ruotolo. The agents found a loaded gun on top of the armoire in Ruotolo's bedroom. Ruotolo told them about a second gun in one of his sports jackets, and that weapon was also seized. The agents unloaded both guns and finished the sweep in approximately ten minutes. During the security sweep, the sixth agent remained with Mrs. Ruotolo and the children downstairs. At the conclusion of the sweep, which was conducted with weapons drawn, all agents holstered their guns.

The agents and Ruotolo returned to the kitchen, where Pasterchick read Ruotolo, from a printed card, the warnings prescribed by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and asked him whether he wished to answer any questions and would consent to a search of the house. Ruotolo responded, "I am not sure that I should answer any questions or if I should let you do a search of my home before talking to my lawyer. I don't have anything to hide, but I am not sure." Pasterchick responded, "Fine," but told Ruotolo that because of the ongoing investigation and arrests, he would not be allowed to make any telephone calls and therefore could not contact his attorney. Pasterchick then telephoned fellow agents to advise them that Ruotolo was under arrest and had declined to allow a search of his home, and to request that they proceed to obtain a search warrant. Pasterchick testified that he was aware that affidavits had been prepared in advance to obtain a search warrant for Ruotolo's home, should that prove necessary.

After making the call, Pasterchick returned to the kitchen and told the Ruotolos that arrangements were being made to obtain a warrant. He stated that the agents would remain in the house until he was advised whether a search warrant would be obtained. Ruotolo then initiated a conversation with Pasterchick regarding a consent search. Ruotolo asked Pasterchick whether his consent to a search would expedite matters, and, if so, whether Mrs. Ruotolo and he would be allowed to accompany the agents during the search. Although Pasterchick stated that a warrant

was being obtained and he was accordingly indifferent to Ruotolo's consent to a search, Pasterchick also agreed that the agents would leave upon the conclusion of the search, and that the Ruotolos would be permitted to accompany the DEA agents during the search. Some time during the course of this dialogue, the agents cuffed Ruotolo's hands in front of, rather than behind, him to permit him to smoke cigarettes.

Ruotolo discussed the situation with his wife, and then consented to a search. Pasterchick then went to his car to obtain a consent form that he filled out and read aloud to Mr. and Mrs. Ruotolo, who both signed the form. The consent form was signed at 12:05 a.m. on the morning of March 14, 1988. Aside from the title and signatures, it read as follows:

> I, John Ruotolo and Gail Ruotolo, having been requested to consent to a search of my residence located at 1 Stonebridge, Montclair, NJ and having been duly advised of my constitutional rights to (1) refuse such consent, (2) to require that a search warrant be obtained prior to any search, (3) that if I do consent to a search, any evidence found as a result of such search, can and will be used against me in any civil or criminal proceedings, (4) that I may consult with an attorney of my choosing before or during the search and (5) that I may withdraw my consent to search at any time prior to its conclusion.
>
> After having been advised of my constitutional rights, I hereby knowingly, intelligently and voluntarily waive my above rights and consent to a search and authorize S/A Michael Pasterchick and other Special Agents of the Drug Enforcement Administration, United States Department of Justice, to conduct a complete search of the above described residence.

Two teams of agents, each accompanied by one of the Ruotolos, conducted the search of the house, which lasted about two hours. Upon its completion, Ruotolo was strip searched and then taken to a local jail.[1] Before leaving, Ruotolo gave his wife a card containing an attorney's name and number, and told her to contact the attorney as soon as she could. Also prior to his departure, his handcuffs were removed to permit him to say good night to his daughters, who by then had gone to bed.

The search produced nineteen handguns, passports, sets of gold coins, various documents, and other items. Before the agents left the Ruotolo home, the items seized were inventoried by Pasterchick in the kitchen in the presence of Mrs. Ruotolo. Preparation of the inventory list took approximately two hours. The agents did not leave the Ruotolo home until approximately 5:00 a.m. on March 14, 1988.

The district court held hearings on December 9 and 12, 1988 on Ruotolo's motion to suppress the physical evidence seized during the search. Ruotolo contended, *inter alia,* that this evidence should be suppressed because his consent was obtained in violation of his sixth amendment right to counsel.

As indicated hereinabove; the district court ruled that a postindictment consent to a search is a critical stage of a criminal litigation to which the sixth amendment right to counsel attaches. The court also stated, in a lengthy footnote that reviewed the pertinent testimony at the suppression hearing, that "the consent in this case appears to have been voluntarily made and fairly bargained for." The court nonetheless concluded, in its central ruling:

> Ruotolo was not informed that he was under indictment at the time he gave his consent. Under the case of [sic] law of the Second Circuit, as it presently stands, this information was necessary before Ruotolo could knowingly and intelligently decide whether to proceed without counsel and consent to the search. The evidence seized from his home pursuant

---

**1.** Pasterchick so testified at the suppression hearing. Mrs. Ruotolo testified, however, that her husband was escorted from their home be- fore the search was concluded. The district court concluded that "much of Mrs. Ruotolo's testimony deserves little credit."

to his consent must therefore be suppressed.

The court excepted from its suppression ruling one gun that was seized in plain view during the security sweep, ruling that neither consent nor a search warrant was required for its seizure.

The government appealed this ruling pursuant to 18 U.S.C. § 3731 (1988), providing the certification required by section 3731 "that the appeal is not taken for purpose of delay and that the [suppressed] evidence is a substantial proof of a fact material in the proceeding."

## Discussion

We note at the outset that the central factual premise of the district court's ruling, that "Ruotolo was not informed that he was under indictment at the time he gave his consent" to the search, is not abundantly clear from the record presented to us. The warrant that authorized the DEA agents to arrest Ruotolo commanded them to "bring him ... forthwith to the nearest magistrate to answer a(n) Indictment ... charging him ... with Conspiracy to import heroin into the United States ..., [and] Importation of heroin into the United States ..., in violation of Title 21 United States Code, Section(s) 952, 960, 963." Surely, then, if the arrest warrant had been served upon Ruotolo and he had read it, he would have been aware that he was under indictment. In the course of the suppression hearing, however, Pasterchick was never explicitly asked whether he served the arrest warrant upon Ruotolo. The nearest approach to this critical issue occurred during Pasterchick's cross-examination, as follows:

Q But you are sure you had an arrest warrant?

A I'm positive I saw the arrest warrant that night.

Q I didn't ask you if you saw it. I asked you if you had it personally?

A Yes.

Q You had a copy on your person?

A Yes.

Q In your pocket?

A It was in my briefcase, initially.

Q When did you take it out of your briefcase?

A We probably went to the car to get that.

Q So when you approached the door, you didn't have the briefcase with you, did you?

A No, I did not.

Q So, you didn't have the arrest warrant with you when you approached the door of the Routollo's [sic] residence?

A No.

Q And it wasn't until after you had already concluded the arrest and done your security sweep that you went back out to the car to get your briefcase, correct?

A Yes, that's probably correct.

Q So, the earliest possible moment that you could have displayed this arrest warrant would have been after the arrest and the security sweep, correct?

A It would have been after the arrest and the security sweep, yes.

As is apparent, this testimony leaves open the possibility that Ruotolo was shown the arrest warrant, and thus apprised that he had been indicted, after the arrest and the security sweep, but prior to his consent to the search of his home. The district court categorically stated, however, that "Ruotolo was not informed that he was under indictment at the time he gave his consent." Furthermore, the government has conceded in its appellate brief that this is the case, and presumably would not have done so if it could present a factual argument to the contrary. We therefore address the issue as framed by the district court.

It is settled constitutional law that "[a] person comes under the protection of the sixth ... amendment right to counsel from the moment judicial proceedings are initiated against him, 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *Carvey v. LeFevre*, 611 F.2d 19, 21 (2d Cir. 1979) (quoting *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d

411 (1972)), *cert. denied,* 446 U.S. 921, 100 S.Ct. 1858, 64 L.Ed.2d 276 (1980). Once the right has attached, the defendant is entitled to the representation of counsel, if desired, at any "critical stage" of the criminal proceedings against him. *See Michigan v. Jackson,* 475 U.S. 625, 632 n. 5, 106 S.Ct. 1404, 1409 n. 5, 89 L.Ed.2d 631 (1986); *Coleman v. Alabama,* 399 U.S. 1, 7–10, 90 S.Ct. 1999, 2002–2004, 26 L.Ed.2d 387 (1970); *United States v. Wade,* 388 U.S. 218, 236–37, 87 S.Ct. 1926, 1937–38, 18 L.Ed.2d 1149 (1967); *see also United States v. Jackson,* 886 F.2d 838, 843 (7th Cir.1989) ("Although the right [to counsel] attaches upon the commencement of adversarial proceedings, it only applies to 'critical stages' of those proceedings where absence of defense counsel or lack of advice might derogate from the accused's right to a fair trial."); *Meadows v. Kuhlmann,* 812 F.2d 72, 76 (2d Cir.) ("The Sixth Amendment right to counsel applies only to 'critical stages' of a criminal prosecution."), *cert. denied,* 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987).

Defining a "critical stage," the Supreme Court stated in *Wade:*

> [I]n addition to counsel's presence at trial, the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial.... The presence of counsel at such critical confrontations, as at the trial itself, operates to assure that the accused's interests will be protected consistently with our adversary theory of criminal prosecution.

388 U.S. at 226–27, 87 S.Ct. at 1931–32 (footnotes omitted).

Relinquishment of the sixth amendment right to counsel is closely circumscribed. "To preserve the fairness of the trial process the Court established an appropriately heavy burden on the Government before waiver could be found—'an intentional relinquishment or abandonment of a known right or privilege.'" *Schneckloth v. Bustamonte,* 412 U.S. 218, 236–37, 93 S.Ct. 2041, 2052–53, 36 L.Ed.2d 854 (1973) (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)); *see also Patterson v. Illinois,* 487 U.S. 285, 292, 108 S.Ct. 2389, 2394, 101 L.Ed.2d 261 (1988). Thus, in addition to establishing that a waiver is voluntary, *see Patterson,* 487 U.S. at 292 & n. 4, 108 S.Ct. at 2394 & n. 4, the government must show that the defendant "has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights." *Patterson,* 487 U.S. at 296, 108 S.Ct. at 2397; *see also Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 1140, 89 L.Ed.2d 410 (1986) (waiver of *Miranda* rights); *Adams v. United States ex rel. McCann,* 317 U.S. 269, 279, 63 S.Ct. 236, 241, 87 L.Ed. 268 (1942); *Johnson v. Zerbst,* 304 U.S. at 464, 58 S.Ct. at 1023.

■ Ruotolo contends that the application of these principles in the instant case requires suppression of the evidence seized from his home. Ruotolo concededly had been indicted at the time of his consent to the search which resulted in that seizure. Thus, the sixth amendment right to counsel had attached, and he was entitled to the advice of counsel at any critical stage of the proceedings against him. Accordingly, the pivotal threshold question is whether a consent to a search is a critical stage of a criminal proceeding.

In answering this question in the affirmative, the district court in this case relied upon three prior opinions of the United States District Court for the Eastern District of New York: *United States v. Londono,* 659 F.Supp. 758, 770 (E.D.N.Y.1987), *aff'd on other grounds sub nom. United States v. Carmona,* 858 F.2d 66 (2d Cir. 1988) (per curiam); *United States v. David,* 565 F.Supp. 901, 904 (E.D.N.Y.), *aff'd mem.,* 742 F.2d 1441 (2d Cir.1983); and *United States v. Praetorius,* 457 F.Supp. 329, 334 (E.D.N.Y.1978). We do not find these cases persuasive.

*Praetorius* required a "knowing, informed and intelligent waiver of counsel," 457 F.Supp. at 333, because "even if the defendant's statements were 'voluntary' for purposes of the Fifth Amendment," *id.,* they did not meet " 'the higher standard

with respect to waiver of the right to counsel that applies when the Sixth Amendment has attached.'" *Id.* (quoting *United States v. Satterfield,* 558 F.2d 655, 657 (2d Cir.1976)). This seems clearly at odds with the later ruling in *Patterson* that "whatever warnings suffice for *Miranda*'s purposes will also be sufficient in the context of postindictment questioning." 487 U.S. at 298, 108 S.Ct. at 2398. *David* relied explicitly, *see* 565 F.Supp. at 904, upon the ruling in *United States v. Mohabir,* 624 F.2d 1140, 1153 (2d Cir.1980), that "a valid waiver of the Sixth Amendment right to have counsel present during post-indictment interrogation must be preceded by a federal judicial officer's explanation of the content and significance of this right." This ruling in *Mohabir* has been squarely rejected by the Supreme Court. *See Patterson,* 487 U.S. at 296 n. 8, 108 S.Ct. at 2396 n. 8. *Londono* followed both *Praetorius* and *David. See Londono,* 659 F.Supp. at 770.

In the absence of other cases addressing the issue whether a postindictment consent to a search is a "critical stage" for sixth amendment purposes, we look to the view courts have taken concerning analogous postindictment situations. The considerations animating this examination were expressed by the Supreme Court in *Wade,* 388 U.S. at 227, 87 S.Ct. at 1932, as follows:

> [T]he principle of *Powell v. Alabama* [, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932),] and succeeding cases requires that we scrutinize *any* pretrial confrontation of the accused to determine whether the presence of his counsel is necessary to preserve the defendant's basic right to a fair trial as affected by his right meaningfully to cross-examine the witnesses against him and to have effective assistance of counsel at the trial itself. It calls upon us to analyze whether potential substantial prejudice to defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice.

A pretrial lineup was held to be a critical stage in *Wade. See id.* at 236–37, 87 S.Ct. at 1937–38. The Court pointed to the fact that a lineup is a trial-like confrontation, as

well as to the potential for suggestiveness and overreaching by the prosecution. 388 U.S. at 227–39, 87 S.Ct. at 1932–39; *see also Meadows v. Kuhlmann,* 812 F.2d at 75–76. Similarly, postindictment interrogation was ruled a critical stage in *Michigan v. Jackson,* 475 U.S. at 630, 106 S.Ct. at 1408. On the other hand, a pretrial photo display identification has been held not to be a critical stage, *see United States v. Ash,* 413 U.S. 300, 321, 93 S.Ct. 2568, 2579, 37 L.Ed.2d 619 (1973); nor is the taking of handwriting exemplars, *see Gilbert v. California,* 388 U.S. 263, 267, 87 S.Ct. 1951, 1953, 18 L.Ed.2d 1178 (1967); *United States v. Jacobowitz,* 877 F.2d 162, 169 (2d Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 186, 107 L.Ed.2d 141 (1989), or of fingerprints or samples of blood, hair, or clothing, *see Wade,* 388 U.S. at 227, 87 S.Ct. at 1932.

The sixth amendment protects a defendant's right to a fair trial. Accordingly, "the 'trial' guarantees that have been applied to the 'pretrial' stage of the criminal process are similarly designed to protect the fairness of the trial itself." *Schneckloth,* 412 U.S. at 238–39, 93 S.Ct. at 2053–54; *see also United States v. Gouveia,* 467 U.S. 180, 189, 104 S.Ct. 2292, 2298, 81 L.Ed.2d 146 (1984). It is therefore important to evaluate "whether confrontation with counsel at trial can serve as a substitute for counsel at the pretrial confrontation." *Ash,* 413 U.S. at 316, 93 S.Ct. at 2577. Thus, the taking of fingerprints, or of samples of blood, hair or clothing, is not deemed a critical stage because "the accused has the opportunity for a meaningful confrontation of the Government's case at trial through the ordinary processes of cross-examination of the Government's expert witnesses and the presentation of the evidence of his own experts." *Wade,* 388 U.S. at 227–28, 87 S.Ct. at 1932–33; *see also Ash,* 413 U.S. at 316, 93 S.Ct. at 2577.

These considerations weigh against a conclusion that a "critical stage" of the criminal proceeding against Ruotolo occurred at the time of his consent to the search of his home. No confrontation occurred, as in the case of a lineup, which

would result in adverse consequences difficult to remedy at trial. No evidence was generated, as in the case of incriminating testimony, that was not already in existence and virtually certain to be available to the government in due course. In this connection, there is no contention that the government would not ultimately have obtained a warrant to search Ruotolo's home if his consent had not been forthcoming. In sum, it is difficult to ascertain what benefit would have accrued to Ruotolo, or what detriment he might have avoided, if counsel had been available to him at that juncture. We conclude that, at least on the facts presented in this case, Ruotolo's consent to the search of his residence was not a critical stage of the criminal proceeding against him.

The district court reached a contrary conclusion. The court noted that the Supreme Court, in *Patterson,* had attacked "the holding and the underlying reasoning of *Mohabir* " by ruling that *Miranda* warnings suffice to inform an indictee of his sixth amendment right to counsel, *see Patterson,* 487 U.S. at 296–97, 108 S.Ct. at 2396–97, and by explicitly rejecting *Mohabir's* requirement that a sixth amendment waiver can properly be made only before a neutral judicial officer, *see id.* at 296 n. 8, 108 S.Ct. at 2396 n. 8. The district court also noted, however, that *Patterson,* which dealt with a defendant who had concededly been advised of his indictment, therefore did

> not address the question of whether or not an accused must be told that he has been indicted before a postindictment Sixth Amendment waiver will be valid. Nor do we even pass on the desirability of so informing the accused—a matter that can be reasonably debated.

*Patterson,* 487 U.S. at 296 n. 8, 108 S.Ct. at 2397 n. 8.

The district court concluded that *Mohabir* "remains good law in this Circuit" as to the requirement that an accused be "told that he has been indicted before a postindictment Sixth Amendment waiver will be valid." The district court addressed the "critical stage" requirement (in addition to

relying upon prior Eastern District cases discussed hereinabove) as follows:

> Although *Patterson* involved postindictment statements as opposed to a consent to search, its analysis would appear to apply with equal force to both situations: in both, the value of counsel is limited to simple advice, i.e., whether to give consent or not, whether to answer a question or not.

As indicated earlier, we disagree with this analysis of the "critical stage" issue, at least on the facts presented here, and therefore do not reach the question whether an indictee must be explicitly advised that he has been indicted in order to render effective a waiver of sixth amendment rights. Finding the sixth amendment inapplicable, we conclude that Ruotolo's consent to the search of his home must be judged by fourth amendment standards, the question to which we now turn.

As indicated earlier, the district court considered the voluntariness of Ruotolo's consent in a lengthy footnote to its opinion, concluding that "the consent in this case appears to have been voluntarily made and fairly bargained for." As the government concedes in its brief, however, this statement did not constitute an ultimate finding as to voluntariness. Accordingly, we will not undertake this determination in the first instance, but rather set forth the general considerations pertinent to the ruling that must be made upon remand.

As the Supreme Court stated in *Schneckloth,* "There is a vast difference between those rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment." 412 U.S. at 241, 93 S.Ct. at 2055. The central purpose of the fourth amendment is "[t]he security of [the defendant's] privacy against arbitrary intrusion by the police." *Wolf v. Colorado,* 338 U.S. 25, 27, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782 (1949), *overruled on other grounds, Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

■ It is accordingly established fourth amendment law that an individual has a right to be free from unreasonable searches and seizures, and that "a search

conducted without a warrant issued upon probable cause is '*per se* unreasonable ... subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth,* 412 U.S. at 219, 93 S.Ct. at 2043 (quoting *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)). "It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Id.* The prosecutor has the burden of proof, *see Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968), and the consent to search should be deemed valid if, given the totality of the surrounding circumstances, the consent was voluntarily given, and not the product of duress or coercion. *See Schneckloth,* 412 U.S. at 226–27, 93 S.Ct. at 2047–48; *United States v. Calvente,* 722 F.2d 1019, 1023 (2d Cir.1983), *cert. denied,* 471 U.S. 1021, 105 S.Ct. 2030, 85 L.Ed.2d 313 (1985). In determining voluntariness under this fourth amendment test, knowledge of the right to refuse consent is only one factor in the analysis. *See Schneckloth,* 412 U.S. at 226–27, 247–48 & n. 37, 93 S.Ct. at 2047–48, 2058–59 & n. 37.

■ Ruotolo contends that the refusal of the DEA agents to allow him to contact his attorney, the lateness of the hour, the presence of six DEA agents in his home, and the assurance that they would remain there indefinitely pending the availability of a search warrant combine to require a finding that his consent was not voluntarily given. At the suppression hearing, furthermore, Ruotolo's counsel stressed that the consent form signed by Ruotolo and his wife recited "that I may consult with an attorney of my choosing before or during the search," although it is uncontested that this was not the case. We note also that Ruotolo was handcuffed most of the time from his arrest until his departure from his residence. After the initial security sweep, however, he was cuffed with his hands in front of his body to allow him to smoke cigarettes, and the handcuffs were removed to allow him to take leave of his family prior to his departure.

In its review of this issue, the district court discounted much of the testimony of Ruotolo's wife and daughter in support of Ruotolo's contention that "the agents terrorized his family, forcing him to consent to search in order to get the agents out of the house as quickly as possible." The court noted that neither the coercion inherent in the fact of arrest, *see United States v. Valencia,* 645 F.2d 1158, 1165 (2d Cir. 1980) (citing *United States v. Watson,* 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976)), nor a representation that a warrant will be obtained if consent is withheld, *see Calvente,* 722 F.2d at 1023 (citing *United States v. Faruolo,* 506 F.2d 490, 495 (2d Cir.1974); *United States v. Lace,* 669 F.2d 46, 52 (2d Cir.), *cert. denied,* 459 U.S. 854, 103 S.Ct. 121, 74 L.Ed.2d 106 (1982)), suffices to establish coercion. Nor does a finding of coercion follow from the fact that Ruotolo was handcuffed. *See United States v. Crespo,* 834 F.2d 267, 271 (2d Cir.1987), *cert. denied,* 485 U.S. 1007, 108 S.Ct. 1471, 99 L.Ed.2d 700 (1988). Ruotolo's relative sophistication, as a twenty-year police veteran and private investigator who had attended college, is a factor tending against a finding of involuntariness, *see id.* at 272; *United States v. Price,* 599 F.2d 494, 503 (2d Cir.1979), as is the fact that he was given *Miranda* warnings, *see United States v. Jones,* 475 F.2d 723, 730 (5th Cir.), *cert. denied,* 414 U.S. 841, 94 S.Ct. 96, 38 L.Ed.2d 77 (1973).

In any event, the *totality* of the circumstances must be weighed and considered in light of established fourth amendment principles governing the issue of voluntariness. *Cf.* 3 W. LaFave, Search and Seizure § 8.2(b), at 181 (1987) ("While it is unlikely that a single coercive element will, standing alone, be enough to invalidate a consent, several of them in combination certainly will."). We remand for this determination by the district court.

### Conclusion

The order of the district court granting defendant-appellee's motion to suppress physical evidence obtained during the consent search of his home is reversed, and

the case is remanded for further proceedings not inconsistent with this opinion.